1        IN THE UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF FLORIDA
2             TALLAHASSEE DIVISION

3

4

5

6  In re:

7

8  JAMES LEE SIMPSON,
   LLC.,                 Case No. 13-40125
                       Chapter 12
9     Debtor.
   _____/
10

11

12                ORIGINAL

13

14

15  2004 EXAMINATION OF:      JOHN T. BELL, P.E.
                       Vol. 1, Pages 1 - 24
16

17  TAKEN AT THE INSTANCE OF:  Capital City Bank

18  DATE:               June 19, 2013

19  LOCATION:           1435 Piedmont Drive
                       Tallahassee, Florida
20  TIME:               Commenced:  9:00 a.m.
                       Concluded:  9:50 a.m.
21

22  REPORTED BY:         LISA GAINEY, RMR, RPR
                       Notary Public in and
23                       for the State of
                       Florida at Large
24

25

1                  A P P E A R A N C E S

2    Representing Mr. Bell:

3                   ALBERT PENSON
                    1435 Piedmont Drive
4                   Tallahassee, Florida   323

5
     Representing the Terry and Marie Taylor:
6

7                   JAMES M. DONOHUE
                    KEVIN FORSTHOEFEL
8
                    Ausley McMullen
9                   123 South Calhoun
                    Tallahassee, Florida   32301
10

11
                    *  *  *  *  *
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    I N D E X

2    WITNESS:        DIRECT   CROSS   REDIRECT   RECROSS

3    JOHN BELL

4    By Mr. Donohue     3

5    Certificate of reporter                      24

6

7

8

9                    *  *  *  *  *

10

11

12

13                  E X H I B I T S

14   NUMBER/LETTER:                            PAGE

15   1 - Computation of interest on account     10

16   2 - Demand promissory note                 17

17   3 - Assignment of notes                    18

18   4 - Promissory note                        19

19   5 - Second morgage                         19

20   6 - Second mortgage                        21

21

22                  *  *  *  *  *

23

24

25
```

MERIT REPORTING - (850) 224-6262

1                    P R O C E E D I N G S

2                      JOHN T. BELL

3     was called as a witness, having been first duly

4     sworn, was examined and testified as follows:

5                    DIRECT EXAMINATION

6     BY MR. DONOHUE:

7          Q     Mr. Bell, my name is Jim Donohue.  I'm the

8     attorney in this James Simpson Chapter 12 bankruptcy

9     case.  I'm the attorney for Terry and Marie Taylor.

10    They are secured creditors in this case.

11              The primary purpose are for this

12    deposition today is for you to explain any monies

13    that may be owed by the debtor in this case,

14    Mr. Simpson to you individually, monies you've loaned

15    to him.

16              You had previously produced, pursuant to

17    our subpoena, a number documents.  I'm going to ask

18    you simply to identify those documents today for the

19    record.  And just generally explain circumstances

20    surrounding monies loaned by you to Mr. Simpson

21    beginning approximately in 2003 and I think going

22    from there through 2008-2009, somewhere in there.

23    But during that general period.

24              If you have a question about a question I

25    ask and if you don't understand anything, please let

1   me know.  I'll try to restate the question.  I'm just
2   trying to get you to explain to me and, ultimately to
3   the court, what the circumstances and facts were
4   surrounding your loan of monies to the debtor in this
5   Chapter 12.
6          So, if you would, please, state your name
7   for the record?
8     A     I have one question before we start.
9     Q     Sure.  Certainly.
10    A     You indicated that you represent the
11   Taylors in the bankruptcy.  Do you also represent the
12   Taylors in the foreclosure of the first mortgage?
13    Q     No, I do not.  They're represented by J.
14   D. DuRant.
15    A     Thank you.  Answering your first question,
16   my name is John T. Bell, B-e-l-l.
17    Q     And Mr. Bell, where do you reside?
18    A     503 McDaniel, Tallahassee, 32303.
19    Q     And are you employed at this time?
20    A     I'm self-employed or employed by a
21   corporation that I own, Coloney-Bell Engineering.
22   The corporation name is CTTE, Inc., d/b/a, Coloney-
23   Bell Engineering.
24    Q     Thank you.  Do you know the debtor in this
25   case James Simpson?

1    A    Yes.

2    Q    How long have you known him?

3    A    Since 1996.

4    Q    Were you familiar with his purchase of a

5    sod farm in Gadsden County back in the nineties?

6    A    I became familiar with that in probably

7    2000-2001.  Up to that point, I knew him through

8    Wayne Coloney who I purchased what became

9    Coloney-Bell Engineering.  Mr. Simpson had previously

10   worked for one of Mr. Colony's former corporations.

11        So, that was my contact with Jimmy

12   Simpson.  I had retained his services from time to

13   time as a consultant for my forensic engineering

14   practice as an electrician.

15   Q    And through your contact with Mr. Simpson,

16   you became aware of the fact that he was in the sod

17   business?

18   A    Yes.

19   Q    In your involvement with Mr. Simpson and

20   his ownership of a sod business, did you loan money

21   to that sod business or to Mr. Simpson in order for

22   that sod business to operate?

23   A    Which sod business are we talking about?

24   Q    My understanding is there was a

25   corporation by the name of Havana Sod and Pallet,

1    Inc., that was owned by several folks.  You, I
2    believe, had an interest in that at one time; is that
3    correct?
4         A    Yes.  Would you like me to explain that
5    history?
6         Q    If you would, please.
7         A    In 2003 -- it may have been late 2002 -- I
8    became aware that Jimmy was in a bankruptcy, a
9    Chapter 12 bankruptcy.  And at that time, I believe
10   he was operating as either Simpson Farms or to Topos
11   Theos.
12             I'm not sure how he was operating.  Based
13   on his tax returns, it looks like it was just -- they
14   were running the income from the sod farm on a farm
15   income part of their 1040 tax returns.  I learned
16   that when he gave me a business plan that his
17   accountant had put together, I believe, as a part of
18   that Chapter 12 bankruptcy.  He was trying to obtain
19   bank financing to take care of the first mortgage and
20   continue operations.
21             I did due diligence.  I studied the sod
22   industry.  At the time, we were in the beginning of a
23   housing boom, and income looked attractive for sod
24   farms.  Jimmy and I were very good friends.  He and I
25   were on our way back from a trial to Orlando where we

1  had both testified as expert witnesses and

2  discussions about what was going on lead to my

3  thoughts that this would be a profitable endeavor for

4  me to become involved in.

5          My analysis at that time was Mr. Simpson's

6  primary problem was he didn't have the operating

7  capital to buy equipment that he needed.  And his sod

8  harvester at that time was the one that he had bought

9  from the Taylors as a part of the farm.

10          Sod harvesting equipment has a pretty

11  finite life period, and he was spending a lot of

12  money on maintenance.  He would get an order and

13  couldn't fill it because his machine wasn't working.

14  He was essentially renting a machine from Kary

15  Freeman and that's K-a-r-y, Freeman, F-r-e-e-m-a-n,

16  who was doing business as All You Need Sodding.

17          Based on those conversations with

18  Mr. Simpson and my analysis, I developed a business

19  plan.  We agreed that if I were going to be an

20  investor or assist him with operating capital, we

21  would incorporate what became the company name Havana

22  Sod and Pallet, Inc., which I'll probably refer to

23  later as HSP, the initials.

24          Fairly very early on, we purchased the sod

25  harvester and a forklift and a pallet dismantler

1  because part of the business was refurbishing pallets

2  and reselling them.  So, we had two income streams.

3  I was the personal guarantor on those pieces of

4  equipment.  They were purchased by the corporation.

5      Q    Let me ask you this:  That's your entry

6  into your sod and pallet business?

7      A    Yes.

8      Q    And there was a corporation set up and you

9  then had occasion, as I understand it from the

10  documents that you delivered to me earlier, that you

11  loaned money to this corporation beginning in the

12  spring of 2003 and continuing through at least August

13  of 2006.

14           On numerous occasions, you advanced funds

15  invested in or loaned money to this corporation; is

16  that correct?

17      A    I was loaning operating -- borrowed

18  operating capital.

19      Q    You provided to me in the document

20  production a list of transactions, if you will,

21  summarized on a document that is titled Havana Sod

22  and Pallet, Inc., shareholder loan, John T. Bell.  I

23  want to show you a copy of that document.

24      A    (Examining document.)  I prepared this

25  document and provided a copy of it to Mr. Simpson on

1    August 29, 2006.

2        Q     And this document accurately reflects the

3    amount of loans or advances of capital that you made

4    to the corporation; is that correct?

5        A     It shows the total principal amount, the

6    dates that those loans are made, and it shows

7    interest calculations based on those loans.  So, this

8    is an amortization schedule, if you will, that would

9    be negative amortization, and the interest is

10   growing.

11         The only modification to this document

12   that I see is your exhibit number down in the lower

13   right-hand corner.

14       Q     Okay.  So, based on this document as of

15   August 29th of 2006, it shows the total principle and

16   interest that was owed to you at that time from this

17   corporation was $441,777.64; is that correct?

18       A     Yes.

19         MR. DONOHUE:  I would like to identify

20      this as Exhibit No. 1 for the deposition.

21         (Exhibit No. 1 marked.)

22   BY MR. DONOHUE:

23       Q     Now, in August of 2006 -- I'm sorry,

24   before I get to that, I also have documents that were

25   provided to me.  Subject to our subpoena, you

1   delivered documents which appear to be demand

2   promissory notes that match up with the notes listed

3   in what we have marked as Exhibit No. 1.

4            We have these notes marked as composite

5   Exhibit No. 2.  I would ask you to take a look at

6   those documents and see if you can please identify

7   those as the promissory notes that correspond to

8   what's been listed.

9        A    Would you like me to take the time and

10   compare them?

11       Q    I would, if you don't mind, just to be

12   sure that we have an accurate exhibit.

13       A    April 17, $10,000; May 9, 2003, $10,000;

14   June 5, 2003, $20,000; June 27, 2003, $4,200.

15   There's a typo in the printed principle, but the

16   written and in-parentheses number is correct.

17            July 3, 2003, $10,000; July 10, 2003,

18   $10,000; July 24, 2003, $20,000; July 24, 2003,

19   $4,445.46.  And the reason that's an odd amount was I

20   made a direct payment for payroll taxes that were in

21   arrears.

22            August 15, 2003, $2,920.86.  Again, that

23   was a payroll deposit that I wrote a personal check

24   from and deposited it at Capital City Bank in our

25   payroll account.

1   August 22, 2003, $10,000; August 25, 2003,

2   $20,000; October 31, 2003, $12,000; December 31,

3   $16,300.  And I don't offhand remember why that was

4   not an even thousand.

5   June 2, 2004, $5,000.  Giving about a

6   six-month gap between my last investment and

7   June 2nd, which at the time I thought we were turning

8   around cash flow-wise.

9   June 14, $5,000 of 2004.  August 20th of

10  2004, $44,000.  And if you'll notice on my schedule

11  on 6/16/2004 and 6/24/2004, there are two negative

12  amounts of $5,000.  Those were payments back to me,

13  loan payments.  They actually match up to the

14  June 2nd and June 14th.

15  So, on June 20th, pretty much my 2004

16  operating loans, whatever we want to call them, had

17  been repaid.  It wasn't until August 20, 2004, I

18  wrote a check to the company for $44,000.  So, that

19  particular payment was in anticipation of the

20  Simpsons having to make their 2004 payment to the

21  Taylors.  And I believe the documentation will show

22  that that was an advance on Simpson Farm's payables.

23  And the explanation of that is the

24  Simpsons owned the farm.  Havana Sod and Pallet would

25  harvest grass off of both of Simpson Farms and other

1    farms that we either leased or had an agreement and
2    there was an agreed-upon price per square foot for
3    what we harvested.
4            So, at this point in time, my recollection
5    is we had mostly been harvesting off of other
6    people's properties.  We were anticipating moving to
7    the Simpson field fairly shortly.  And so, the
8    corporation booked my -- my accountant actually
9    booked a prepayment against future payables based on
10   the Simpson Farms.
11       Q    Let me interrupt you real quickly.
12   Without your advancing $44,000 on August 20, 2004 --
13   without those funds, Mr. Simpson would not have been
14   able to make his confirmed Chapter 12 payment to the
15   Simpsons; is that correct?
16       A    That's correct.
17       Q    Thank you.
18       A    October 14, 2004, $7,600; October 23,
19   $7,000.  And this continual incremental investment
20   was due to the Simpsons' inability to provide me with
21   current up-to-date financial information.  So, there
22   would be a crisis on October 14th with creditors
23   demanding payment, late payments building up.
24            I would ask him for a total.  We need
25   $7,600.  I'd put that money in the checking account

1   thinking that we were caught up.  And then 13 days or

2   less than 13 days later, nine days later, we need

3   another $7,000.

4           So, as the 51 percent owner of the

5   corporation from the very beginning, I could not even

6   get the checkbook.  And when I did, there was no

7   running balance in the checkbook.  We could not get a

8   list of payables.  We could not get a list of

9   receivables.  My accountant was screaming at me all

10  the time.

11          And that's what led to all these

12  incremental cash investments.  I'm sorry if I

13  digress.

14      Q       No, that's fine.  Thank you.

15      A       I was on October 23rd which was the $7,000

16  payment.  October 18, 2004 --

17      Q       Would that be November 18th?

18      A       Yes, November 18, 2004, $2,000;

19  November 30, 2004, $6,000; December 16, 2004, $6,000;

20  January 14, 2005, $20,000; March 25, 2005, $16,700;

21  April 12, 2005, $5,000; September 8, 2005, $10,000.

22          Somehow during 2005 in August, the

23  Simpsons had enough funds to make their payment to

24  Terry Taylor.  That is my recollection.  I just

25  finished this one, right?

1        Q        **September 8.  I believe that's correct.**

2        A        September 16, 2005, $10,000; October 28th,

3   2005, $20,000; December 15, 2005, $10,000;

4   December 23, 2005, $10,000; July 6, 2006,

5   $18,000.000.  Again, about a six-month lag.  And I

6   was beginning to believe maybe we were going to turn

7   things around in 2006.

8              July 14, 2006, $13,000, which is basically

9   the following week.  Again, inability to project cash

10  flow needs by the Simpsons.  July 20, 2006, $20,000.

11  And in this exhibit, it's missing the documentation

12  for the August 29, 2006, $20,000, which, if memory

13  serves, there's a handwritten note from Mr. Simpson

14  to CTTE, Inc.

15             That was the check that I hand delivered

16  to him on August 29, 2006.  It was made a part of

17  this second mortgage.  You should have that in your

18  documentation somewhere.  And Mr. Rude -- we filled

19  out the document and then he said write novation on

20  there.  I'm not sure what that means, but that's how

21  that note went into the mortgage.

22       Q        **But the $20,000 that was -- there was**

23  **$20,000 advanced to the corporation by you on**

24  **August 29; is that correct?**

25       A        Memory serves that that was a check

1  written straight to the Simpsons.

2       Q     Okay.  And then that amount would have

3  been incorporated into the subsequent note secured by

4  a second mortgage that was given to you by the

5  Simpsons; is that correct?

6       A     Correct, yes.

7       Q     Let me see one thing.  If I could ask you

8  with regard to -- and thank you for going through

9  that detail.  You have all the notes that you just

10 referenced in front of you that you just itemized

11 from Exhibit 1 and compared them to Exhibit 1.  All

12 of those notes were to Havana Sod and Pallet, Inc.;

13 is that correct?  I mean, they were from Havana Sod

14 and Pallet -- excuse me.

15       You advanced funds, and you got a note

16 back from Havana Sod and Pallet payable to you in the

17 various amounts I just itemized; is that correct?

18 What I'm getting at is the notes were executed by you

19 as the chair of Havana Sod and Pallet, Inc.; is that

20 correct?  Is that your true and correct signature on

21 all of those notes?

22       A     They were executed by both myself --

23       Q     I was getting to that.  And also

24 Mr. Simpson as president of that corporate entity.

25       A     Correct.

1        Q       And were these signed by Mr. Simpson in

2   your presence?

3        A       Yes.

4        Q       So, that is his true and correct signature

5   on all of the notes we just went through?

6        A       Yes.

7        Q       And that's your signature as well?

8        A       Yes.

9        MR. DONOHUE:  I would like to mark those

10       notes that were just referenced the as composite

11       Exhibit No. 2 to be attached to the examination.

12       (Exhibit No. 2 marked.)

13   BY MR. DONOHUE:

14       Q       Now, Mr. Bell, in August of 2006, explain

15   to me what happened in August of 2006 with regard to

16   these obligations that were owed to you by the

17   corporate entity Havana Sod and Pallet, Inc.

18       A       I assigned all the notes in composite

19   Exhibit 2 to Mr. Simpson personally in satisfaction

20   or exchange for, or whatever the legal term is, a

21   second mortgage on the property.

22       Q       Let me show you an assignment of notes

23   dated August 29, 2006.  If you would identify that,

24   please.

25       A       (Examining document.)  This is the

1    assignment of notes that I just referred to.

2        Q    And is that your signature on there?

3        A    Yes.

4        Q    Let's mark that as Exhibit No. 3 for the

5    purposes of this 2004 exam.

6            (Exhibit No. 3 marked.)

7    BY MR. DONOHUE:

8        Q    Mr. Bell, I would now show you a

9    promissory note is also dated August 29th and would

10   ask if you could identify that note as being part of

11   this transaction where the prior notes, Exhibit

12   No. 2, were assigned to Mr. Simpson.  And that note

13   was given back to you at that time?

14       A    (Examining document.)  Yes.

15       Q    Was that note signed in your presence?

16       A    Yes.

17       Q    And that is Mr. Simpson's signature?  You

18   watched him sign that?

19       A    I did.

20       Q    Who prepared these documents?  Do you

21   recall?

22       A    Attorney Ed Rude.

23       Q    And these documents, this assignment and

24   promissory note in the second mortgage we'll get to

25   in a minute -- those were all prepared by Mr. Rude

1    and executed in his office?

2        A    Yes.

3        Q    And you were there at the time of the

4    execution by Mr. Simpson?

5        A    Yes.

6             MR. DONOHUE:  Thank you.  I want to mark

7        this promissory note as Exhibit No. 4.

8             (Exhibit No. 4 marked.)

9    BY MR. DONOHUE:

10       Q    Also on August 29, Mr. Bell, there's a

11   second mortgage that I mentioned earlier securing the

12   note that we have marked as Exhibit No. 4, I believe.

13   I want to show you this second mortgage dated August

14   of 29 of 2006 and see if you can identify that.

15       A    (Examining document.)  Yes.

16       Q    That was signed in your presence by

17   Mr. Simpson?

18       A    Yes, it was.

19       Q    Mr. Rude was there as well?

20       A    Yes, he was.

21       Q    I would like to mark that as Exhibit No. 5

22   to be attached to this examination.

23            (Exhibit No. 5 marked.)

24            MR. DONOHUE:  If we could go off the

25        record just for one moment.

1              (Discussion off the record.)
2    BY MR. DONOHUE:
3         Q     Mr. Bell, going back to the second
4    mortgage that has been identified as Exhibit No. 5,
5    we talked about the execution of that in front of
6    Mr. Rude who prepared it.  He apparently notarized
7    it.  There also is a signature.
8              Just explain to me the circumstances
9    surrounding the signature of that document at that
10   time.  I understand you were there in Mr. Rude's
11   office at the time it was signed?
12        A     Yes.
13        Q     Explain to me how that all occurred.
14        A     We had a confirmed appointed time where
15   the Simpsons and I would meet at Mr. Rude's office to
16   sign the mortgage and the note and the assignment.
17   Mr. Simpson showed up by himself.  Mr. Rude asked him
18   where his wife was, Geralean Simpson.  He said she's
19   at home.  He said, well, her name is on the deed.
20   She's got to be here.  Go home and get her.
21             So, Mr. Simpson left and drove out to
22   Salem Road in Havana and came back, however much time
23   that took, and then we executed those documents in
24   Mr. Rude's office.
25        Q     So, you were there when both Mr. Simpson

1    and Geralean Simpson executed the second mortgage?

2         A    Yes.

3         Q    That's Exhibit No. 5.  I now have marked

4    as Exhibit No. 6 that same second mortgage, but it's

5    one that has been recorded in Gadsden County,

6    Florida.  I would show that to you to see if you can

7    identify it as being the same mortgage as Exhibit

8    No. 5 but one that was recorded in Gadsden County.

9         A    (Examining document.)  This is that

10   particular document, yes.

11        Q    Were you involved in having that recorded

12   over there?

13        A    Mr. Rude and I rode to Gadsden County and

14   went up to the Clerk of the Circuit Court's office

15   and recorded this together.

16        Q    So, that is the mortgage that was recorded

17   over there -- you can identify that as Exhibit No. 6?

18        A    Yes.

19             (Exhibit No. 6 marked.)

20   BY MR. DONOHUE:

21        Q    Now, that's the extent of the exhibits

22   that I would want you to identify, but what we've

23   gone through this morning represents amounts owed to

24   you plus accrued interest that were secured by the

25   second mortgage.

1          It's my understanding that there were

2     other funds that you advanced that are owed to you at

3     this time by Mr. Simpson individually; is that

4     correct?

5          A    Yes.

6          Q    Can you just generally describe

7     approximately what the amount of that is and the

8     circumstances surrounding the advance by you of those

9     funds?

10         A    We're not talking about advances to the

11    corporation after the second mortgage.  We're talking

12    about an advance from me personally to Mr. Simpson

13    personally.

14         Q    That's correct.  That's correct.  Just

15    individual.

16         A    In 2008 in August -- or it may have been

17    September.  Because the payment to Mr. Taylor was in

18    arrears, I loaned Mr. Simpson the exact amount of

19    monies owed to Mr. Taylor which included the annual

20    payment and any late fees or interest that he claimed

21    was owed.

22              And after securing that note from

23    Mr. Simpson, I personally mailed by certified mail a

24    cashier's check in that amount to Mr. Taylor.

25         Q    That was approximately how much would you

1    guess?  You have a note for that?  Is that what you

2    said?

3         A     Yes.

4         Q     Were there any other funds advanced to him

5    individually, advanced by you to Mr. Simpson?

6         A     Other than the notes to the corporation

7    which at that time he was the sole owner of, I don't

8    recall.

9         Q     That's fine.  That's fine.

10        A     And in answer to your question a minute

11   ago, my recollection is it's $32,000 and some change,

12   but I have that document.

13        Q     That's fine.

14              MR. DONOHUE:  I have no further questions

15        at this time.  I appreciate your cooperation and

16        your detailed responses.  Thank you.

17              MR. PENSON:  Let's go off the record for

18        just a minute.

19              (Discussion off the record.)

20              MR. PENSON:  No questions.

21              (Reading of transcript retained.)

22              (Proceedings concluded at 9:50 a.m.)

23                    *  *  *  *  *

24

25

**ACKNOWLEDGMENT OF REPORTER**

1

2      I hereby acknowledge that the witness herein was
deposed and testified as is hereinabove shown; that
3      the testimony of said witness was reduced to computer
transcription under my personal supervision and is a
4      true and accurate record of the proceedings;

5      THAT the deposition was taken at the time and
place as specified;
6

7      THAT I am neither of kin nor of counsel to any
of the parties involved in this matter, nor in any
8      manner interested in the results thereof.

9      THIS 19th day of June, 2013.

10

11                                   _____
                                     LISA GAINEY
12

13                        *   *   *   *   *

14                    **CERTIFICATE OF NOTARY**

15      STATE OF FLORIDA )
        COUNTY  OF  LEON )
16

17      I, LISA GAINEY, Notary Public in and for the
State of Florida at Large, do hereby certify that the
18      witness personally appeared before me and was by me
first duly sworn to testify to the truth on the date
and time indicated herein.
19

20      THIS 19th day of June, 2013.

21

22
        ┌─────────────────────────────┐   _____
        │    LISA GAINEY              │   LISA GAINEY, RMR, RPR
23      │    Commission # EE 198942   │   My Commission Expires:
        │    Expires May 23, 2016     │                5/23/2016
        │  Bonded Thru Troy Fain Insurance 800-385-7019 │
24      └─────────────────────────────┘

25

MERIT REPORTING - (850) 224-6262