```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF FLORIDA
2                       BANKRUPTCY COURT

3

4

5

6   IN RE:                         CASE NO.: 13-40125-KKS
                                    CHAPTER 12
7   James Lee Simpson,

8          Debtor.
    _____/
9

10

11

12

13  PROCEEDINGS:                    Hearing
                                    Vol. 1, Pages 1 - 66
14  BEFORE:                         Honorable Karen K.
                                       Specie
15
    DATE:                           November 18, 2013
16
    LOCATION:                       Bankruptcy Court
17                                  Tallahassee, Florida

18  TIME:                           Commenced:  1:30 p.m.
                                    Concluded:  2:45 p.m.
19
    REPORTED BY:                    ANDREA KOMARIDIS
20                                  Notary Public in and
                                    for the State of
21                                  Florida at Large

22

23              O R I G I N A L

24

25
```

1                    A P P E A R A N C E S

2    Representing the Debtor:

3                         ALLEN TURNAGE

4                         Law Office of Allen Turnage
                         P. O. Box 15219
5                         2344 Centerville Road,
                            Suite 101
6                         Tallahassee, FL 32317

7

     Representing Terry and Marie Taylor:
8
                         JAMES M. DONOHUE
9                         KEVIN FORSTHOEFEL

10                        Ausley & McMullen
                         Post Office Box 391
11                        Tallahassee, FL 32301

12

     Representing John Bell:
13
                         ALBERT C. PENSON
14
                         Penson Law Firm
15                        1435 Piedmont Drive East,
                            Suite 101
16                        Tallahassee, FL 32308

17

     Representing the United States Trustee:
18
                         WALTER W. KELLEY
19
                         Kelley, Lovett & Blakey,
20                          P.C.
                         2539 Lafayette Plaza Drive
21                        Albany, GA 31707

22

23                        * * * * *

24

25

1                    I N D E X

2   WITNESS:              DIRECT  CROSS  REDIRECT  RECROSS

3   JAMES LEE SIMPSON

4   By Mr. Turnage          30
    By Mr. Donohue                  34
5   By Mr. Penson                            46

6

7   Certificate of reporter                          66

8

9

10

11                    * * * * *

12

13

14

15                 E X H I B I T S

16   NUMBER/LETTER:                              PAGE:

17   1 - 18 - Exhibits of Creditors

18          Terry and Marie Taylor              30

19

20

21

22                    * * * * *

23

24

25

1        <u>**P R O C E E D I N G S**</u>

2        THE COURT:  This afternoon, we have before

3    the Court the case of James Lee Simpson,

4    Chapter 12 Case No. 13-40125.  The Court has

5    before it consideration of confirmation of the

6    debtor's Chapter 12 plan; an application for

7    compensation for attorney for the creditor; a

8    motion to dismiss the case with prejudice and

9    request for hearing; and the debtor's motion to

10   continue or reschedule the hearing on

11   confirmation.

12        The Court will take appearances, please.

13        MR. TURNAGE:  Good afternoon.  May it

14   please the Court, Allen Turnage for Mr. Simpson.

15        THE COURT:  Mr. Turnage.

16        MR. DONOHUE:  Thank you, Your Honor.  Jim

17   Donohue representing Terry and Marie Taylor,

18   secured creditors.

19        MR. PENSON:  Good afternoon, Your Honor.

20   Al Penson on behalf of creditor, John Bell.

21        THE COURT:  Thank you, Mr. Penson,

22   Mr. Donohue.

23        Is there anyone else appearing in this

24   case?

25        MR. DONOHUE:  Your Honor, I'm sorry.

1    Kevin Forsthoefel, an associate of my firm, is

2    here as well representing the Taylors.

3         THE COURT:  And how do you spell that last

4    name, please?

5         MR. DONOHUE:  I believe it's

6    F-o-r-s-t-h-o-e-f-e-l.

7         THE COURT:  I'm glad I asked.  Thank you.

8         Court Call, please.

9         MR. KELLEY:  Yes, thank you, Your Honor.

10   This is Walter Kelley, Chapter 12 Trustee.

11        THE COURT:  Thank you, Mr. Kelley.

12        Anyone else appearing in this case?  Let

13   the record reflect there is no one else

14   appearing.

15        First of all, is anyone opposing the

16   application for compensation?

17        MR. TURNAGE:  Judge, we did file an

18   objection to that.  It's Docket No. 66.

19        THE COURT:  All right.  Thank you.

20        Mr. Turnage, it seems appropriate to argue

21   your motion to continue.  But I will advise the

22   parties that I am, at this point, prepared to

23   rule on the issue of the validity of the

24   mortgage lien held by or claimed by Mr. Bell.

25        And so, it seems appropriate to announce

1   that ruling first because that may affect how

2   the parties wish to proceed with respect to the

3   matters pending.  I'm going to announce my

4   ruling verbally, and then will follow it with an

5   order.

6          First of all, this matter came before the

7   Court for hearing on September 19th, 2013, upon

8   the debtor's motion to determine the validity of

9   the lien of the defendant.  It said "defendant,"

10  but should have said claimant or Mr. Bell since

11  is there no defendant in this case.  That's at

12  Docket No. 26.

13         At the hearing, the Court heard testimony

14  and argument of Counsel and received documentary

15  evidence and received evidence on behalf of

16  Mr. Bell and other witnesses.  Based on the

17  entire record and the evidence presented at the

18  hearing, these are the Court's findings.

19         The debtor and Mr. Bell were business

20  partners.  At the time in question, they each

21  owned 50 percent of the stock in Havana Sod and

22  Pallet, Inc.  Over several years, Mr. Bell

23  loaned money to Havana to help pay business

24  expenses.  In exchange, Havana gave Mr. Bell 34

25  promissory notes reflecting these loans.  All

1    were held by and payable to Mr. Bell.

2         On August 29th, 2006, the debtor and

3    Mr. Bell entered into an agreement.  As part of

4    this agreement, Mr. Bell executed an assignment

5    of notes assigning to the debtor all of the

6    notes, which at that time, had an aggregate

7    principal balance of $375,066.32.

8         As consideration for Mr. Bell's assignment

9    of the notes to the debtor, the debtor signed a

10   promissory note payable to Mr. Bell in the

11   amount of $441,770.  And he and his wife signed

12   a second mortgage on their homestead to secure

13   payment of the note to Mr. Bell.

14        Now, as to the promissory note and

15   mortgage that I just mentioned, without

16   question, in his motion, the debtor alleged that

17   he did not sign the original promissory note or

18   the mortgage.  That's at Docket No. 26.

19        This allegation, however, was refuted by

20   the testimony of Attorney C. Edwin Rude at the

21   hearing.  Mr. Rude testified that he prepared

22   the note and mortgage and that the debtor signed

23   both of those documents in his presence.  The

24   debtor did not cross examine, take issue with or

25   produce sufficient evidence to refute or negate

1     this testimony.

2          The debtor further alleged that even if he

3     had signed the note and mortgage, the mortgage

4     would fail due to lack of consideration.  And

5     that is the issue before the Court with respect

6     to this matter.

7          At the hearing, the debtor raised for the

8     first time the issue that because Mr. Bell did

9     not endorse the notes -- in other words, the

10    notes that were payable to Mr. Bell by Havana,

11    the corporation -- there was no consideration

12    for the $441,770 promissory note that he signed

13    and, in particular, no consideration for the

14    second mortgage lien on his homestead.

15         This Court took that matter under

16    advisement as to whether the lack of the

17    endorsement on those notes by Mr. Bell resulted

18    in failure of consideration for the note and

19    mortgage signed by the debtor and his wife, such

20    that the lien represented by the mortgage was

21    invalid or unenforceable.

22         The debtor and Mr. Bell briefed the issues

23    at the Court's request.  And after reviewing all

24    of the pleadings, the evidence and the brief,

25    this Court finds that, despite the lack of

1    endorsement by Mr. Bell on the notes, there was

2    still a valid transfer of the notes, and the

3    mortgage lien is not invalid for lack of

4    consideration.

5         Mr. Bell argued that because he delivered

6    the notes to the debtor and provided an

7    assignment of the notes, that qualified the

8    debtor as a holder of the notes under the

9    Florida statute.  This argument is not correct,

10   but this issue is not dispositive in this case

11   in any event.

12        Although the delivery of the notes to the

13   debtor without an endorsement may have failed to

14   provide the debtor with the status of a holder

15   as defined in the Florida statutes, the actual

16   transfer of the notes to the debtor vested in

17   the debtor any rights of Mr. Bell to enforce the

18   instruments.  And that is found at Florida

19   Statute 673.2031(2).  And that's the 2013

20   version.

21        Specifically, the Florida statutes provide

22   that the transfer of an instrument, whether or

23   not the transfer is a negotiation, vests in the

24   transferee any right of the transferor to

25   enforce the instrument.

1        If an instrument is transferred for value,

2    but because of lack of endorsement the

3    transferee does not become a holder, then the

4    transferee has a specifically enforceable right

5    to the unqualified endorsement of the

6    transferor.  Here, the transferor, being

7    Mr. Bell, has already agreed to endorse the

8    notes at any request that the debtor might make.

9        The Supreme Court of Florida has held

10   that -- and I quote, "If at the time of the

11   transfer of the notes, the parties are silent

12   upon the subject of endorsement, then the law

13   implies an agreement by the transferor to

14   endorse a negotiable instrument when it is made

15   payable to his order.

16        "When a note is handed over for valuable

17   consideration, the endorsement is mere form.

18   The transfer for consideration is the substance.

19   It creates an equitable right and entitles the

20   party to call for the form."

21        And that's the case of Parr vs. Fort

22   Pierce Bank and Trust Company at 100 Fla., 941.

23   And the quote comes from Page 948.  It's a 1930

24   Florida Supreme Court case.  And it cites other

25   cases.

HEARING - IN RE:  JAMES LEE SIMPSON - 11/18/2013

1        Here, because Mr. Bell delivered the notes

2    to the debtor along with a written assignment of

3    the notes, the applicable provisions of the

4    Florida statutes entitle the debtor to enforce

5    the notes and give the debtor a specifically

6    enforceable right to an unqualified endorsement

7    by Mr. Bell.

8        Nothing is keeping the debtor from seeking

9    or obtaining Mr. Bell's endorsement on the

10   notes, which Mr. Bell testified that he is

11   perfectly willing to give.  Did Mr. Bell hand

12   the notes over for valuable consideration?  It

13   is this Court's view that he did.  His

14   consideration was the note from the debtor and

15   the second mortgage on the debtor's homestead.

16       The case cited by the debtor, *GMT*

17   *Properties, Inc.,* stands for the limited

18   proposition that holder-in-due-course status can

19   only be achieved when a negotiable instrument is

20   negotiated by transferred possession plus the

21   endorsement of the named payee.

22       That case does not hold, however, that the

23   lack of an endorsement of the notes amounts to a

24   failure of consideration.  Holder-in-due-course

25   status does not equate with consideration.

1          The debtor, although he may not be a

2     holder in due course, acquired the rights to

3     enforce the notes under the Florida statutes at

4     the time they were delivered to him, which was

5     August 29th, 2006.  The notes constitute

6     consideration for the mortgage on the debtor's

7     property.

8          And so, for the reasons stated, it is the

9     Court's ruling that the mortgage lien held by

10    John T. Bell is valid; that that mortgage lien

11    does not fail due to lack of consideration, due

12    to the lack of an endorsement on the notes

13    assigned to the debtor by Mr. Bell.  I also find

14    that the debtor signed the actual promissory

15    note to Mr. Bell, and the actual mortgage, as

16    well, was signed by the debtor and his wife.

17         That is the ruling of this Court on that

18    issue.  The Court, however, without changing

19    this ruling, reserves the right to add, alter or

20    delete any language, grammar or punctuation in

21    this oral decision so that it correctly reflects

22    the Court's intention in determining this

23    proceeding.  To preserve this right, this

24    opinion will only be available by way of

25    transcript and not through a tape recording.

1      Does anyone have any questions on that

2  aspect of this case?  There being none, we will

3  move, now, to the debtor's motion to continue or

4  reschedule hearing on Chapter 12 plan.

5      MR. TURNAGE:  Your Honor, since this is my

6  motion, again, especially given that impact of

7  that hearing, that's certainly going to result

8  in changes to the debtor's plan.  I think it

9  emphasizes the need for a continuance rather

10  than -- rather than working the other way

11  around.

12      In other words, we certainly need time to

13  reformulate the plan and propose another

14  different plan that incorporates the Court's

15  ruling into the plan and proposed payments and

16  treatment under the plan.

17      And other issues aside -- which, of

18  course, I will be glad to speak to after we

19  discuss the opposition to that continuance.  But

20  we need some additional time to figure out how

21  Mr. Simpson is going to be able to keep his

22  farm.

23      THE COURT:  Thank you, Mr. Turnage.

24  Mr. Donohue?

25      MR. DONOHUE:  Your Honor, thank you.  And

1    thank you for ruling on that issue at this time.

2    I think it clarifies where we are in this case

3    to a great extent.

4        At the beginning of this case, in

5    representing the Taylors, who have a $200,000

6    first mortgage on the farm in question, it was

7    our intent to try to get a resolution to the

8    issue of Mr. Bell's lien; whether it was, in

9    fact, a valid second mortgage behind them on the

10   same property because if it was -- and given the

11   amount of that lien -- it would pretty much put

12   this reorganization completely out of question.

13        The income that this particular debtor

14   has -- the capability of that sod farm to

15   produce anywhere near the amount of revenue that

16   would be required to service secured debt in the

17   amount, not only of my clients' $200,000

18   obligation, but Mr. Bell's much, much larger

19   obligation -- I think our estimates were in the

20   $750,000 range as far as those first two

21   mortgage liens.

22        And this is in a case where I think we're

23   prepared today to show through the three-year

24   tax returns before this year that the farm

25   income was a negative figure one year.  It was

1    no income another year.  And in 2012, which I

2    believe was the tax return filed with the Court

3    by Mr. Turnage just last week, it showed farm

4    income of 14,000.

5        Well, the monthly cash receipts and

6    disbursement statements that have been filed

7    with this Court thus far -- I think it's

8    important to note that the March and April

9    reports were never filed.  They are not in the

10   record of this proceeding.  March and April were

11   not filed.  May was filed timely.  June, July,

12   August, September, and October were filed on

13   October 29th after we moved to dismiss the case.

14       But those reports reflect that the sole

15   income of this debtor since the filing of this

16   case on March 5th, more than eight months ago --

17   the sole income has been $1,000 a month roughly

18   that Mr. Simpson has realized from Social

19   Security.

20       There is an admission in his response to

21   our motion to dismiss in Paragraph 6 of that

22   pleading, I believe -- I don't have the docket

23   number.  But in that pleading, the

24   representation was made that the debtor has

25   realized zero income from farming operations for

1    the last eight months.

2        This is what supposedly is going to be

3    reconfigured, now, in another plan and is going

4    to somehow cover an additional $500,000 in

5    secured debt on top of $200,000 in secured debt.

6    And I would represent to the Court that I don't

7    think there is any way on this green earth that

8    anyone could come up with a plan to cover that

9    type of claims that are validly before this

10   Court.

11       Mr. Bell filed a timely-filed claim.  My

12   clients filed it.  My clients have an undisputed

13   first lien on the property.  Now Mr. Bell has a

14   second -- he has a very large claim.  This

15   debtor has no income except his Social Security.

16       The evidence we're prepared to put on

17   today indicates that he is not actually farming

18   this property.  It's 92 acres with a home on it.

19   It's where he lives.  It's a sod farm.  He's not

20   actually -- his testimony at the 341 meeting --

21   the transcript has been filed with the Court.

22       He merely gets paid seven and a half cents

23   a square for all the sod that is cut on his

24   property by Havana Sod and Pallet, which is a

25   separate entity.  They are the ones that

1    maintain the property, that cut it, that sell

2    it.  He simply gets paid seven and a half cents

3    a square.

4         By his own admission, he hasn't sold

5    one -- he hasn't received compensation for one

6    square foot of sod since March 5th.  And now,

7    the debtor is seeking additional time to file a

8    plan to try to cover somewhere in the

9    neighborhood of $750,000 in secured debt when

10   there virtually is no income being derived from

11   this farming operation.

12        The other prong to Mr. Turnage's motion to

13   continue was that the sod is, now, ready for

14   harvest and that he would be harvesting -- the

15   debtor would be harvesting his crop at this

16   point.  And he needed a continuance of an

17   indeterminate period of time to harvest his

18   crop.

19        It would lead the Court to believe that

20   we're dealing with a crop similar to a cotton

21   crop or a soybean crop where you harvest it once

22   a year and you realize your income for the year

23   from that harvest.

24        We're talking about sod.  Sod -- you get a

25   call on the phone -- again, in the 341

1    transcript -- this debtor does not have any

2    commercial accounts.  He does not cut sod for

3    commercial accounts.  That was his testimony at

4    the 341.

5         He hasn't done anything in eight months

6    based on those monthly reports that he's filed.

7    So, it hasn't been happening since his case was

8    filed.  But his testimony at the 341 is they

9    wait for a phonecall, they cut the sod that's

10   ordered in the phonecall, and they deliver that

11   sod.

12        The Court may or may not be aware, but

13   when you cut sod, you can't stack it somewhere

14   and come back and get it later to be laid down.

15   It has to be laid immediately.  It dies.  It

16   disintegrates.  It falls apart.  You cannot hold

17   sod like you can bushels of corn or bails of

18   cotton or something like that.

19        Sod is cut periodically as orders come in.

20   Other crops are harvested once a year and sold

21   and results in a large amount of income at one

22   time.  That's not what we're dealing with.  What

23   we're dealing with here unquestionably,

24   irrefutably is a debtor who has sold zero sod in

25   the eight months that it's been reorganized.

1          Now, you couple that with the fact that

2     when this plan was filed -- the initial plan was

3     filed in, I believe, May or June of this year.

4     It was filed late.  It took a letter from the

5     Trustee for the plan to be filed.

6          When the plan was filed, under our local

7     rules, there was to be a pre-confirmation

8     statement filed with that plan.  It was not

9     filed.  It has not been filed since then.  That

10    statement is supposed to provide not only the

11    Court and the Trustee, but also creditors with

12    projections of income, the source of the income,

13    the ability of the debtor to pay the claims that

14    are listed in his plan that the statement is

15    filed with.  And so, people at that time have an

16    indication of where this case is going.  That

17    was never filed.

18         We do not have any idea -- we do not have

19    the first projection of income to cover the

20    claim of my client, $200,000 secured claim.  But

21    now we add to that a further secured claim of

22    more than twice that amount.  And we have no

23    projections, but we do have these statements

24    that there has been no sod cut for eight months.

25         And we know from the nature of the crop

1      that it's not like they have been saving it up

2      to cut it all at once.  And we're going into the

3      worst time of the year to sell the sod.  It's

4      the middle of the winter.  The grass is going to

5      be brown.  And sod is sold, as I understand it,

6      at other times of the year.  We can put

7      testimony on as to that.

8           So, basically, we feel that any attempt to

9      revise the plan, amend the plan, given this

10     Court's ruling, given the lack of income that we

11     have had eight months to see -- we now know it.

12     Once October 29th came around and these reports

13     that had not been filed since the May report was

14     filed -- when we got those, we saw -- the

15     reports were unsigned.  They weren't even signed

16     by the debtor as required.

17          But they reflected only Social Security

18     income.  And after the payment of expenses,

19     there was literally just a couple of hundred

20     dollars left each month for, I guess, disposable

21     income to try to apply to a plan.

22          And to have that type of income with the

23     now known amount of secured debt -- I think it's

24     disingenuous to grant a continuance for a

25     further amount of time to amend the plan that

1    virtually has nowhere to go.

2         THE COURT:  Thank you, Mr. Donohue.

3         Mr. Penson?

4         MR. PENSON:  Your Honor, without

5    belaboring the point, the debtor in this case,

6    going back into the State foreclosure actions,

7    has done nothing to resolve the issues of his

8    creditors, including the filing of this

9    Chapter 12 plan.

10        The record reflects that he has done

11   minimal work.  He hasn't done the reports he's

12   supposed to have done.  He hasn't filed when

13   he's supposed to file.  He hasn't signed what he

14   did file.

15        And to ask for a continuance is just

16   delaying the inevitable.  The documentation

17   that's been submitted with regard to the motion

18   to dismiss is uncontroverted and overwhelmingly

19   demonstrates that this matter should be

20   dismissed.

21        There is nothing in this record that

22   indicates -- no matter how long this case is

23   continued or he's given more time to file

24   another plan -- that he is going to be able to

25   pay the indebtedness based on his own

1     documentation.  And therefore, we would object

2     to the continuance.

3          THE COURT:  Thank you.

4          Mr. Kelley?

5          MR. KELLEY:  Thank you, Your Honor.  There

6     are four claims filed in this case.  Mr. Bell's

7     claim is for a million dollars.  The Internal

8     Revenue Service is 21,876, and another one for

9     2186.04.  Then there is the Taylors' claim for

10    214,000.  And then Florida Department of Revenue

11    for 286, of which, 143 is priority.

12         So, we're not dealing with a large number

13    of creditors, but of the creditors who filed

14    claims, their claims -- two out of the four are

15    large claims.

16         The Court's ruling in the Bell matter, I

17    think, is a game-changer insofar as whether the

18    Court wants to proceed with a feasibility

19    analysis.

20         I think the thought probably was that if

21    the Bell claim was invalid, then the only claim

22    you would have to deal with would be the claims

23    of Mr. and Mrs. Taylor, in which case, they

24    might be able to cobble a plan together to pay

25    it.

1      But it does not appear that Mr. Simpson

2  has adequate income at the time to fund the

3  plan.  And the case I always go back to is the

4  Court's ruling, 11th Circuit case, of *In Re:*

5  *Cornelison*, which was a 1990 case that outlined

6  the specific findings that the Court has to have

7  in order to confirm the case.

8      And I think if the Court were going to

9  continue the case, we would want to know that

10  Mr. Simpson could comply with those

11  requirements, which are that the plan is

12  feasible; that we can outline the specific

13  payments amounts; where the income is going to

14  come from and that sort of thing.

15      Otherwise, if there is no way that

16  Mr. Simpson can comply with *Cornelison* either

17  today or 90 days from now, then there is

18  probably no point in going further with it.

19      I think now that Mr. Taylor's claim is

20  first, the Bells are second -- and how much that

21  property is worth, I don't know.  But to the

22  extent that Mr. Bell is secured, he filed a

23  secured claim of $790,000.  It would be

24  impossible, based upon the current income of

25  Mr. Simpson, to fund it.

1       THE COURT:  Thank you, Mr. Kelley.

2       Mr. Turnage?

3       MR. TURNAGE:  Thank you, Your Honor.  And

4   certainly given the Court's ruling, we would

5   need to incorporate Mr. Bell's claim into

6   consideration of the plan.  It can be bifurcated

7   so that we can pay the secured value of his

8   secured claim for any equity in the farm --

9   depending on whose value that you talk about.

10  It may be as low as 300,000 -- so that we may be

11  talking about a secured claim of $100,000,

12  which, if we extended the term of repayment

13  under the Taylors' -- to the Taylors' debt and

14  extend the term of repayment of that $100,000,

15  then it's not entirely unimaginable that we

16  could present a confirmable plan to the Court.

17      And I'm not asking for an indeterminate

18  period of time.  I agree that certainly

19  Chapter 12 in general as well as the Bankruptcy

20  process needs to move along.

21      And I would request a continuance of no

22  more than 45 days.  That would give me time to

23  do the math, look at the income that Mr. Simpson

24  is, now, producing from the farm.  His testimony

25  will be that he's harvesting sod.  And we will

1    talk about the income that he is producing and

2    is able to produce in the foreseeable future

3    with some realistic projections.  And we could

4    be in or out in 45 days.

5        And so, then the question seems to me,

6    what harm would come to these creditors if that

7    nominal continuance was granted.

8        I think it's also telling that the request

9    to dismiss the case with prejudice -- I agree

10   that if we can't present a confirmable

11   Chapter 12 plan as we stand, then we're not

12   going to be able to refile it as a Chapter 12.

13   I just think that it's telling that that was the

14   avenue that was taken rather than a motion for

15   relief from stay.

16       There is one month's -- there is one

17   annual payment that has come due to the Taylors

18   that was not paid that we could have reached

19   terms under the plan as to the Taylors, who are,

20   without dispute, an over-secured creditor by

21   something in the range 50 percent.

22       Their claim is about $200,000.  And under

23   the lowest valuation that's presented to the

24   Court, the value of the farm is about $300,000.

25   So, they are over-secured by a comfortable

1    equity cushion.  There is no need for them to

2    stand on Mr. Simpson in the way that has been

3    done here.

4         The question, of course, is Mr. Bell's

5    claim.  Mr. Bell doesn't have a motion to

6    dismiss pending, I don't think.  I know that he

7    sort of me-too-ed on the objection to

8    confirmation of the plan.  And given the Court's

9    ruling, we do need to address his claim.

10        But the question is whether the Taylors

11   have valid grounds to have Mr. Simpson's case

12   dismissed.  Can we pay another hundred thousand

13   dollars under this plan in some reasonable

14   length of time?  I think we can.

15        But that's not even the question.  The

16   question is whether a continuance should be

17   granted, whether a continuance would be

18   prejudicial to these creditors.

19        And they have already got State law

20   foreclosure actions that are well along in the

21   case in the foreclosure actions in State law so

22   that another 45 days or so of a continuance is

23   in balance given the nominal delay to the

24   creditors versus the debtor losing his farm.

25        I think that on balance tends toward the

1      grant of a continuance of the confirmation

2      hearing, especially given the fact that we have

3      only just gotten the Court's ruling.

4           So, is there a possibility?  Yes.  Is it

5      slim?  Yes, but that's what debtors do.  I have

6      debtors make -- make it on a shoestring.  So,

7      it's entirely possible that this debtor can put

8      together a plan that would be feasible.

9           He's strongly motivated to do so.  He's

10      owned this farm for a long time and he has every

11      motivation to retain it.  There is nominal

12      prejudice to the creditors.  And we would ask

13      the Court to grant my motion for continuance.

14           THE COURT:  Mr. Turnage, my concern with

15      granting continuance is that if you do look at

16      the DIP reports, it does appear that no -- even

17      the plan today is not feasible.  So, what good

18      will a continuance do?

19           MR. TURNAGE:  It's true that he hasn't had

20      any farm income yet.  But he is cutting sod as

21      we speak.  The sod is being harvested.  So,

22      there is farm income now.  And it's true the DIP

23      reports don't show any farm income and there

24      hasn't been any income to the farm.

25           But it is also the situation where last

1     year, the debtor had some $15,000 in net income

2     from the farm as shown on his 2012 tax return.

3     So, we're talking about a plan payment that's

4     not too much more than that depending on his

5     ability to sell sod and to get contracts for the

6     sale of those properties.

7          So, again, I would posit to the Court that

8     the equities here weigh strongly in favor a

9     continuance.

10         THE COURT:  Well, I certainly agree that a

11    ruling of the magnitude that I just gave on

12    Mr. Bell's claim changes the game, especially

13    from the debtor's standpoint.  And I did not

14    give any indication to any of the Counsel prior

15    to today that that ruling was going to come out,

16    although hopefully everyone knew that it was

17    coming soon since it had already been briefed.

18         Having said that, however, I'm still

19    concerned that this case may be going nowhere

20    pretty quickly.  So, I'm going to deny the

21    motion for continuance on a limited basis.

22         I want to go ahead and start taking

23    evidence today that goes to confirmation -- or

24    at least feasibility of any plan and the other

25    issues raised in the motion to dismiss.

1          I have another matter scheduled at 2:45.

2     We will conclude today no later than 2:45, and

3     then we will continue this hearing for the rest

4     of the evidence as soon as the Court can

5     schedule enough time for a continued evidentiary

6     hearing.

7          So, with that, Mr. Turnage, on

8     confirmation -- and once again, we're talking

9     about at least the debtor's income and

10    projections.  Please call your first witness.

11         MR. TURNAGE:  Thank you, Your Honor.  I

12    will call Mr. Simpson to the stand.

13         THE COURT:  Mr. Simpson, if you would,

14    please come by the witness stand, remain

15    standing and raise your right hand so you can be

16    sworn in.

17                    * * * * *

18                **JAMES LEE SIMPSON**

19    **was called as a witness, having been first duly**

20    **sworn, was examined and testified as follows:**

21         MR. DONOHUE:  Your Honor, if I may, a

22    housekeeping note.  Mr. Turnage and I agreed

23    before the hearing this afternoon that all of

24    the exhibits that we have on our exhibit list

25    are fine with him.  He would agree to their

1       admissibility.  And I would, therefore, with the

2       Court's approval, move those into evidence prior

3       to the beginning of the hearing.

4               THE COURT:  Mr. Turnage, no objection?

5               MR. TURNAGE:  No objection.

6               THE COURT:  Does any other party have any

7       objection to the exhibits being offered into

8       evidence at this time on behalf of Mr. Donohue

9       for the Taylors?  And that's at Docket No. 79.

10              Hearing none, those exhibits are admitted

11      into evidence.  Thank you.

12              (Creditor's Exhibit Nos. 1 through 18

13      admitted.)

14              THE COURT:  You may proceed, Mr. Turnage.

15              MR. TURNAGE:  Thank you, Your Honor.

16                    **DIRECT EXAMINATION**

17  BY MR. TURNAGE:

18      **Q      State your name for the Court.**

19      A      James Simpson.

20      **Q      And you're the individual debtor who filed**

21  **this Chapter 12 Bankruptcy proceeding?**

22      A      I am.

23      **Q      And briefly tell the Court how this farm**

24  **operation is set up as far as the structure for who**

25  **sells what and what you receive out of that.**

1      A      The farm is owned by Jimmy Simpson.  The

2  operation of the farm is done by Havana Sod and

3  Pallet.  A portion of what is harvested from it goes

4  to Jimmy Simpson for the income from the farm.

5      **Q      So, any income from the farm that you**

6  **receive or note on your schedules is the net income**

7  **to Jimmy Simpson.**

8      A      That is correct.

9      **Q      After payment of all of the expenses to**

10  **Havana Sod and Pallet, which is the operator of the**

11  **farm.**

12      A      No, sir.

13      **Q      Okay.**

14      A      No, sir.  The Havana Sod and Pallet pays

15  all the costs on the operation of the farm.  They

16  have, at this point in time for the last year, put

17  almost $30,000 into the farm for fertilization,

18  herbicides, pesticides, fuel, equipment, and other

19  things.

20      **Q      So, when we filed this petition in**

21  **Schedule I, we listed your income -- and I'm going to**

22  **show you what I've -- this is Exhibit No. 1 of**

23  **Mr. Donohue's exhibits.**

24          **And so, down at the very bottom of that**

25  **line, there is a notation there for income from**

HEARING - IN RE:  JAMES LEE SIMPSON - 11/18/2013

1  Havana Sod and Pallet, correct?

2      A     Yes.

3      Q     And what's that number?

4      A     $2,000.

5      Q     And that's $2,000 a month.

6      A     Correct.

7      Q     So, that would be about $24,000 a year.

8      A     Correct.

9      Q     Based on the contracts that you now hold

10 and the contracts that you're cutting for, do you

11 think you're going to earn $24,000?  You, Jimmy

12 Simpson -- are you going to earn $24,000 from your

13 farm this year?

14     A     This fiscal year?

15     Q     This calendar year.

16     A     This calendar year?

17     Q     Yeah.

18     A     I don't know.

19     Q     But pretty close to that?

20     A     Pretty close to that, but I don't know

21 that because the economy is changing and people are

22 beginning to move stuff and the grass is beginning to

23 move.  And we're showing an increase of about

24 1 percent per month on movement of grass.

25     Q     And we've heard about the reports being

1  **late.  But those reports were late because you didn't**

2  **have any farm income, correct?**

3      A     That's correct.

4      **Q     But the income is coming in to the farm**

5  **now.**

6      A     It's been coming in for one month, yes.

7      **Q     And that's the month of October.**

8      A     The grass became ready to be harvested a

9  month ago.  We started harvesting a month ago.  And

10  as it comes in, it will continue to increase.

11      **Q     We heard some discussion about the fact**

12  **that grass is not an annually-harvested crop; is that**

13  **right?**

14      A     No, it's not.  Yes, it's annually

15  harvested.  It's not harvested at one time.  It's

16  harvested year round.

17      **Q     So, you're starting the annual rotation by**

18  **harvesting the crops now?**

19      A     Correct.

20      **Q     And you're convinced that you can make**

21  **$24,000 a year off of the sod sales.**

22      A     Yes, sir.

23      **Q     How long have you owned this farm,**

24  **Mr. Simpson?**

25      A     Since '96.

1    Q    There has also been some discussion about
2  the fact that you didn't have any farm income in the
3  couple of years prior to 2012.  Why was that?
4    A    We have been seven years without almost
5  any income from the farm or anything else because of
6  the economy.  It just fell apart.  Everything did.
7  And we've been working hard to bring things back.
8  Some of it, we have moved; some of it, we haven't.
9    Q    Is there any other reason that caused you
10  to lose interest in farming for a while?
11    A    I lost my wife.
12    Q    What year was that?
13    A    '90 -- '09.
14    MR. TURNAGE:  2009?
15    Nothing further at this time, Your Honor.
16  The witness for the Court.
17    THE COURT:  Thank you, Mr. Turnage.
18    Mr. Donohue.
19    MR. DONOHUE:  Thank you, Your Honor.
20    CROSS EXAMINATION
21  BY MR. DONOHUE:
22    Q    Mr. Simpson, my name is Jim Donohue.  I
23  represent Terry and Marie Taylor.
24    You have testified that your Schedule I
25  that you filed with your petition indicated farm

1   income of $2,000 a month.  Were you making $2,000 a

2   month at the time you filed your petition on

3   March 5th?

4       A    I would have to go back and look.  You're

5   asking me a question that I don't know the answer to.

6       Q    Okay.  Well, the reason I asked you is

7   because you signed the petition saying that's what

8   you were making at that time.  So, I --

9       A    Well, if I signed the petition and my

10  attorney told me this is where I was at, I did.

11      Q    So, you were making $2,000 a month in

12  March.

13      A    I told you again, I can't answer that

14  because I don't have anything in front of me.

15      Q    All right.  Your 2012 tax return -- let me

16  get a copy of that for you to look at.  It's one of

17  our exhibits.  I will have it here in a minute -- but

18  my understanding from it -- and I think it was filed

19  with the Court last week by your attorney --

20  indicated that -- and I believe you testified at the

21  341 meeting that you had $14,000 in income in all of

22  2012.  Farm income.  Does that sound correct?

23      A    I really don't know.

24      Q    You don't know?

25      A    No, sir.

1        Q      Okay.  But if you were making $2,000 a
2   month in March, you then went to making zero a month
3   in April?
4        A      That's very possible.
5        Q      Well, again, I don't have -- I have no
6   report of monthly cash receipts and disbursements for
7   either March or April.  So, I need to ask you what
8   you made in those months.  Do you have any idea what
9   your farm income was then?
10       A      No, sir, I do not.
11       Q      You don't.  Okay.  We do have one signed
12  monthly cash receipt and disbursement for income in
13  May.  And this is one you signed.  That reflected
14  zero income.  Do you recall that?
15       A      No, sir, I do not.
16       Q      You don't recall that.
17       A      But if I signed that, that's what it was.
18       Q      Okay.  Let me show you what has been
19  marked as Exhibit No. 17, which is your 1040 form,
20  U.S. individual income tax return for 2012.
21              And I would ask you -- on Line 18 on that
22  income tax return reflects whatever the amount of
23  income was for 2012.  Do you see that entry there?
24       A      On 18?
25       Q      Line 18.

1      A      Line 18, it shows $14,599.

2      **Q      Does that sound correct for the income you**

3 **received from your sod farm operation in 2012?**

4      A      There again, I don't know.

5      **Q      Do you recognize that document as your tax**

6 **return for 2012?**

7      A      That is the tax return that was made up by

8 our accountant.  And he's the one that -- he knows

9 what he did.  I don't.

10      **Q      You don't know what you did.**

11           **That's not a signed copy.  That's just a**

12 **copy I got from your attorney.  But do you recognize**

13 **that as one that you would have signed before you**

14 **sent it in to the Government?**

15      A      I did not send that in.  It was sent in

16 automatically by the accountant.

17      **Q      Without your review or signature?**

18      A      Yes.  He called me and asked me about it.

19 And I told him okay.

20      **Q      So, you have no idea whether that $14,000**

21 **figure is accurate or not.**

22      A      If he did it, I would say it was accurate.

23      **Q      So, that is what your income was for 2012**

24 **from the farm, 14,000.**

25      A      If that's what he put down and that's what

1   it indicates, yes.

2        Q       Okay.  Thank you.

3               Now, this is simply what I'm trying to get

4   to and trying to just get some clarification.

5   $14,000 a year in 2012 is roughly $1100 a month of

6   income from your farm.  Is that about right?

7        A       Over what period of time?  I --

8        Q       For all of 2012.  12 months for -- if you

9   divide 12 into 14,000, it comes out to about a

10  thousand and one or $200 a month.

11              Where I'm going, Mr. Simpson, is when you

12  filed your schedules, your Schedule I, you estimated

13  income of $2,000 a month from your farm.  And I'm

14  trying to figure out where that number came from,

15  especially in light of the fact that every one of

16  your monthly cash reports and disbursement statements

17  that were filed after that during the pendency of

18  this case reflect absolutely no income.

19              Is there an explanation for that?

20       A       The explanation is I don't know the answer

21  to the question you're asking because I did not fill

22  these out.  And the information that was used to fill

23  these out was held by the accountant.  And the

24  attorney took that information.

25       Q       Let me make sure I understand what your

1    testimony is.  These monthly cash receipts and

2    disbursement reports that were filed -- you did not

3    review those, prepare them or sign them?

4        A    That is correct.

5        Q    So, you really don't know what your income

6    is on this farm.

7        A    As of today?

8        Q    Right.

9        A    I know what it used to be --

10       Q    No.  What I --

11       A    -- as of six years ago.  I don't know what

12   it is up to this point because we haven't had

13   anything that you can track.

14       Q    So, it's been not very profitable for the

15   last several years.

16       A    That is true.

17       Q    All right.  I understand that.  And that

18   appears to be what is reflected in the documents you

19   do have.

20            Your projection in the future for income

21   is predicated on what?

22       A    On the income that is coming in at this

23   point in time and based on the growth that we're

24   showing right now, it's showing that it will come on

25   up like it's supposed to.

1       Q       Okay.  And --

2       A       Fertilization, and herbicides, and

3   pesticides that have been applied to it is monies

4   that have been earned by a group and put into it so

5   that it would produce this amount.

6       Q       **You gave a percentage of what that**

7   **increase was going to be.  What was that number?**

8       A       I said it was increasing by about

9   1 percent per month.

10      Q       **Is that 1 percent over the zero that**

11  **you've realized so far or 1 percent of -- what?**

12      A       No, sir.  It's 1 percent of what the

13  company has been doing in the past year.

14      Q       **Which has been what?**

15      A       I don't understand the question.  What --

16      Q       **Okay.  I'm trying to understand what kind**

17  **of increase we're talking about.  And all I know is**

18  **what's of record before the Court, which is very**

19  **little.  The projections that are required have not**

20  **been filed.  I don't have the benefit of those.  And**

21  **I'm trying to piece this together.**

22              **All I've got is your Schedule I where you**

23  **filed with your schedules, which indicated you were**

24  **making and were contemplating to make $2,000 a month.**

25  **And that's what people looked at to see what kind of**

1  case you had and what kind of possibility or

2  feasibility of confirmation there may be.

3          We have come to find out that not only are

4  you not making $2,000 a month, you're not making

5  anything a month from your farming operation.

6          So, I'm trying to figure out -- there are

7  no projections filed with this Court at this time as

8  required by the local rules.  So, I'm trying to get

9  testimony from you that gives me some indication of

10 what these numbers may be.

11         What can you reasonably expect to be

12 receiving in income that you can use to fund a plan,

13 an amended plan, fund any Chapter 12 plan?

14    A     Havana Sod is an entity that is an ongoing

15 entity.  And it has been in the farming and it's been

16 doing something every month.  The projection of

17 1 percent additional every month is coming from what

18 it's done in the past, which is not on this farm, but

19 on other farms.  And the amount of grass that is

20 being utilized by Havana Sod is beginning to increase

21 each and every month.

22    Q     By 1 percent?

23    A     By 1 percent.

24    Q     Okay.  So, let's back up.  So, they are

25 buying sod, not from you, but from someone else.

1    Havana Sod and Pallet.

2         A     They have, yes.

3         Q     So, they haven't bought anything from you

4    during the pendency of this case.

5         A     Yes, they have.  The last month, we have

6    been harvesting every month -- every day.

7         Q     Which month?  Was that in the month of

8    October?

9         A     Yes.

10        Q     We're in the middle of November.  Did they

11   harvest anything from you?  Did you realize any

12   income in October?

13        A     Yes, we have.

14        Q     You did.  Okay.  Well, let's see.  I've

15   got here as Exhibit -- let me make sure what I've got

16   here.  As Exhibit 11, I've got your statement of

17   income for the month of October 2013.

18              And as near as I can tell, it appears to

19   have -- under other receipts for income, it's got

20   zero.  The only income reflected there appears to be

21   the Social Security --

22        A     This one right here (indicating)?

23        Q     Right.

24        A     The grass was harvested, but not paid for.

25   So, therefore, it will be paid for within this month.

1  Therefore, it couldn't appear on here.

2      Q      **How much was harvested?**

3      A      That, I don't know.  I would have to go

4  back and find out.

5      Q      **So, your testimony today to confirm a**

6  **Chapter 12 plan as far as on your projections, your**

7  **answer is you don't know what this is, the projected**

8  **income.  You don't have any idea of the amount of**

9  **income that's going to be generated from sod being**

10  **bought from your property in order to fund the plan**

11  **that's before the Court now or an amended plan that's**

12  **being proposed by your Counsel to be filed and heard**

13  **45 days from now.  You don't have any --**

14      A      The numbers you're looking for would be

15  shown by taking what has happened already this last

16  two months.  And that's where the additional 35 or 45

17  days that the attorney was asking for would be able

18  to show something that you would be understanding.

19      Q      **Well, you have nothing today --**

20      A      That is correct.

21      Q      **-- of that nature.**

22          **Okay.  Mr. Turnage showed you Schedule I**

23  **from your schedules indicating your income.  I don't**

24  **have that in front of me.  I'm going from memory.**

25          **You also indicated in that schedule that**

1    you would make a thousand dollars a month from Watt

2    Miser.  Has that been realized?

3         A    This year, no, it has not.

4         Q    Okay.  So, that was in your Schedule I,

5    but you have not received it.

6              Your Schedule I -- was that number derived

7    from an historical number?  Was that what you had

8    been receiving from them?

9         A    We have contracts in place with

10   instruments in place.  And once those are panned out,

11   then the work will come behind those.  And that's

12   where the projection is right there.  It has happened

13   before.  It will happen again.

14        Q    But is your testimony today that you have

15   these contracts in hand or Watt Miser does?

16        A    Well, they are not -- they are verbal

17   contracts.

18        Q    So, you have nothing to show the Court

19   today as far as what income may be derived from that.

20        A    No, I do not.

21        Q    Now, let me show you Exhibit No. 2, which

22   is Schedule J, which is the current expenditures of

23   individual debtors.  This would have been filed at

24   the same time as your Schedule I.  I'm getting

25   another copy so I can look at it.

1          My recollection is that Schedule J shows

2   expenditures in the amount of some $2800; is that

3   correct?  Expenditures on a monthly basis.

4          A    That's what it's showing, yes.

5          Q    So, the income that you showed on your

6   Schedule I when you filed this case was roughly a

7   thousand dollars from Social Security, a thousand

8   dollars from Watt Miser, and $2,000 from the

9   operation of the sod farm for income that was right

10  at $4,000; is that correct?

11         A    I don't know that for a fact.

12         Q    Schedule I.

13         A    I'm listening to you.

14         Q    Okay.  Well, I don't know if you still

15  have Schedule I or not.  I'm sorry.  Here is

16  Schedule I (handing to witness).  Down at the

17  bottom -- I believe you went over this with

18  Mr. Turnage just a few moments ago.  Does that show

19  income on a monthly basis of $4,000?

20         A    Yes, it does.

21         Q    Now, looking over to Schedule J, it

22  appears to me that you also have average monthly

23  expenses based on your Schedule J you filed with your

24  petition of 2800, almost $2900; is that correct?

25         A    Yes, it is.

1      Q       Leaving disposable income of $1,110.

2              Now, based on your monthly cash receipts

3   and disbursement report, you've reflected zero income

4   from Watt Miser and zero income from the farm for the

5   eight months you've been in Bankruptcy; is that

6   correct?

7      A       Yes, it is.

8      Q       Okay.  So, how are you paying these

9   expenses that you listed in Schedule J?

10     A       There are funds that are in the bank.

11     Q       Savings in the bank?

12     A       No, it's not savings.  It's funds coming

13  from another bank account that my son has.

14     Q       Okay.  So, based on the income that you

15  are producing yourself, you do not have enough income

16  to pay your expenses; is that correct?

17     A       No, I do not.

18             MR. DONOHUE:  I have no further questions,

19     Your Honor.

20             THE COURT:  Thank you, Mr. Donohue.

21             Mr. Penson?

22                   CROSS EXAMINATION

23  BY MR. PENSON:

24     Q       Mr. Simpson, who is the gentleman in the

25  gallery who was with you before we started?

1      A      Charles Brewer.

2      **Q      How is he related to your business?**

3      A      Adopted son.

4      **Q      Formally adopted?**

5      A      I beg -- no.

6      **Q      Does he do work for you?**

7      A      Yes, he does.

8      **Q      Does he do work for Havana Sod and Pallet?**

9      A      Yes, he does.

10     **Q      Does he have an ownership interest in**

11     **Havana Sod and Pallet?**

12     A      Yes, he does.

13     **Q      All right.  Who else owns Havana Sod and**

14     **Pallet?**

15     A      Gary Simpson.

16     **Q      I'm sorry?  Say that again?**

17     A      Gary Simpson.

18     **Q      That's your son?**

19     A      Yes, it is.

20     **Q      Do you have any interest at all in Havana**

21     **Sod and Pallet?**

22     A      I'm an overseer.  I guess that's interest,

23     as far as --

24     **Q      Do you have any ownership interest?**

25     A      No, I do not.

HEARING - IN RE:  JAMES LEE SIMPSON - 11/18/2013

1     **Q      Who has the books and records of Havana**
2  **Sod and Pallet?**
3     A      What books and records are you talking
4  about?
5     **Q      Income and expenses.**
6     A      They are held at Havana Sod and Pallet.
7     **Q      All right.  And who controls those?**
8     A      I do.
9     **Q      You write the checks?  Pay the bills?**
10    A      Yes, I do.
11    **Q      Are you involved in the contracts with**
12 **Havana Sod and Pallet?**
13    A      Yes, I am.
14    **Q      Does Havana Sod and Pallet have any**
15 **written contracts?**
16    A      I beg your pardon?
17    **Q      Does Havana Sod and Pallet have any**
18 **written contracts?**
19    A      No, they do not.
20    **Q      How is sod purchased if there are no**
21 **written contracts?  If I wanted to buy sod, how do I**
22 **go about buying it from you?**
23    A      Call Havana Sod.  The lady will answer the
24 phone and she'll take your order.  It will be
25 processed and shipped to you or you can pick it up.

1      Q      That happens on a year-round basis?

2      A      That happens on a year-round basis, yes.

3      Q      All right.  But your testimony, as I

4 understood it through your testimony in response to

5 the questions by Mr. Donohue, is that up until

6 October, Havana Sod and Pallet, which you oversee,

7 and you keep the books and records for, has not

8 bought any sod from Jimmy Simpson, meaning you

9 personally.

10     A      That's what I said.

11     Q      Why not?

12     A      Because it was not ready.

13     Q      Why wasn't it ready?

14     A      Because God did not make it ready.

15     Q      Well, forgive me -- and I'm a pretty

16 religious man.  What did God have to do with making

17 it ready?

18     A      Without the sun, the rain, the fertilizer

19 all coming together at one time from the beginning

20 where the grass starts to where it's ready for

21 harvest, God has full control over it.

22     Q      Well, I believe that man has evolved

23 enough to provide irrigation when it doesn't rain,

24 correct?

25     A      Yeah, sure.

1       Q       And man has provided fertilizer when God

2   doesn't provide the natural fertilizer, correct?

3       A       That is correct.

4       Q       And the sun has been shining when it's not

5   raining, correct?

6       A       That's correct.

7       Q       And historically, from year to year, you,

8   Jimmy Simpson, have always produced sod year round,

9   correct?

10      A       That is correct.

11      Q       All right.  So, the first time ever that

12  Jimmy Lee Simpson didn't produce sod since you've

13  been in the sod business has been in 2013.

14      A       No, sir.  I told him and I told you, if

15  you were listening to it, that for six years, the

16  farm has not produced because there was no one

17  purchasing that kind of grass.

18      Q       Well, what about your income that you

19  showed $14,000 worth in 2012?

20      A       What about it?

21      Q       Where did that income come from?  The sale

22  of sod, right?

23      A       That, I don't know.

24      Q       Well, you put it on your tax return.

25      A       No, I did not.

1    Q    It's your tax return, right?

2    A    It's my tax return.

3    Q    And you're saying you, as you sit here

4 under oath today, have no idea how $12,000 showed up

5 on your tax return from 2012?

6    A    If the numbers were given to the

7 accountant and he put them down there, then that's

8 what they are.

9    Q    Who would have given the numbers to the

10 accountant?

11   A    The lady who does the bookwork.

12   Q    What bookwork is that?

13   A    Havana Sod and Pallet.

14   Q    All right.  I thought you said you were

15 controlling the books?

16   A    No, I said -- you asked me, do I write

17 checks.  I said yes.

18   Q    And you handle the contracts, right?

19   A    Yes, I do.

20   Q    So, did Havana Sod and Pallet buy any sod

21 from Jimmy Simpson in 2012?

22   A    No, sir.

23   Q    None?

24   A    Wait a minute.  They did, too.

25   Q    Okay.  So, Jimmy Lee Simpson has produced

1    sod, at least in 2012.

2         A     That's true.

3         Q     **But in the year that you decide to go file**

4    **Bankruptcy, you don't produce any sod until**

5    **October of 2013.**

6         A     It was not ready to be picked up.  The

7    only reason it was not ready to be picked up was the

8    sod that was harvested the year before came off of

9    it.  And then the other ground that had never got

10   prepared did not produce.

11        Q     **Whose decision was it not to prepare it to**

12   **produce?**

13        A     I guess it was everybody's decision

14   because there was no funds in the account to be able

15   to purchase the stuff that's necessary to make the

16   sod produce.

17        Q     **Well, I thought you just testified that**

18   **you're using your son's money to do that now.**

19        A     That is true.

20        Q     **Why didn't you do that before?**

21        A     Because it was not there.

22        Q     **Well, how is it suddenly there?**

23        A     I don't understand the question.

24        Q     **How is the money suddenly there to do it**

25   **now when it wasn't there in January of this year?**

1      A      Those were funds that was -- where he got

2   them from, I don't know.  But I do know that he had

3   funds in the account.  And so, therefore, they were

4   used for Havana Sod and Pallet.

5      **Q      All right.  You've talked about this**

6   **increase of 1 percent.  All right.  What's the base**

7   **number that you're using to determine a 1-percent**

8   **increase?**

9      A      As I said before, for the last six years,

10  there was nothing to produce.  Then a year ago -- or

11  actually, a year and a half ago sod started being

12  used.  And as the sod started being used, whatever

13  was used for the month was whatever Havana Sod and

14  Pallet picked up.  Those numbers showed a 1-percent

15  increase per month.  That's where the numbers come

16  from.

17             What is the base number?  I don't know

18  what the base number is because there is not a real

19  base number that I'm aware of.

20     **Q      How can there be a 1-percent increase if**

21  **there is no base?**

22     A      If you take one that was produced the

23  first time when we started producing grass again and

24  use that number, and then the next month, it

25  increases, and the following month, it increases

1   again, and you start looking at the amount that

2   you're producing, you're producing a 1-percent-per-

3   month increase.

4        **Q     What amount are you producing that**

5   **demonstrates a 1-percent increase?**

6        A     I don't know the number that you're

7   looking for, but I can find it for you.

8        **Q     Well, we're here today on a confirmation.**

9   **And you've represented to this Court, at least**

10  **through your Counsel prior to your testimony, that**

11  **you have the ability to fund a plan; that this plan**

12  **is feasible.**

13            **But you, under oath today, when asked,**

14  **can't even give us a single number to demonstrate the**

15  **feasibility.  You throw out a 1-percent number, but**

16  **you don't have what that 1-percent increase equals.**

17  **You don't have the total of the prior amount plus the**

18  **1 percent.  And you don't have the base on which the**

19  **1 percent is computed.**

20            **How are we supposed to determine that the**

21  **plan is even remotely feasible?**

22        A     He asked for a continuation to give him a

23  chance to come up with those numbers.  That's what

24  that is for.

25        **Q     Well, you're testifying to an increase**

1   today.  And I'm asking you where you got the number
2   to determine --
3        A     I'm telling you that's what the number --
4   the request was for was to be able to give you those
5   numbers.
6        Q     But you know enough to testify under oath
7   that there is a 1-percent increase, right?
8        A     Yes, I do.
9        Q     But you don't know what that 1 percent is
10  based on.
11       A     No, I do not.
12       Q     So, then you talked about verbal
13  contracts.  Now, these are verbal contracts for Jimmy
14  Simpson or verbal contracts for Havana Sod and
15  Pallet?
16       A     They are Havana Sod.
17       Q     So, what contracts does Jimmy Simpson
18  have?
19       A     He has contracts with Havana Sod.
20       Q     Written contract?
21       A     Yes, it is a written contract.
22       Q     Where is that?
23       A     I beg your pardon?
24       Q     Where is that written contract today?
25       A     I guess it's in the office.

1     **Q     What's the terms of that contract?**

2     A     7 percent per square foot of harvested

3  grass is due to Jimmy Simpson.

4     **Q     7 percent?**

5     A     7 percent.

6     **Q     And what's that 7 percent based on?**

7     A     I'm not following you.

8     **Q     How would you determine what the 7 percent**

9  **would be?  Is that 7 percent of some gross number?**

10  **7 percent of the net number?  What's the 7 percent**

11  **based on?**

12     A     7 percent is what is based on the use of

13  grass off that farm.  And 7 percent of whatever it

14  sold for belongs to Jimmy Simpson.

15     **Q     So, if I understand correctly, all**

16  **right -- and please tell me if I'm wrong because I**

17  **don't want to put words in your mouth.**

18          **If I have a verbal contract with Havana**

19  **Sod and Pallet for 15 pallets of sod to be delivered**

20  **to my house, and Havana Sod and Pallet decides it's**

21  **going to get that sod off your property, Jimmy Lee**

22  **Simpson's property, you get 7 percent of my cost of**

23  **that sod?**

24     A     You've got the cost of the sod plus the

25  tax, plus the delivery fee, if it is delivered.  That

1   is one number.  If you go back to the cost of the
2   sod, yes, I do.
3        Q     All right.  Well, how do you determine the
4   cost of sod that you get your 7 percent off of?
5        A     The price right now for our pallet of
6   grass is $65.
7        Q     I'm sorry?  Say that --
8        A     The price right now for our pallet of
9   grass is $65.
10       Q     So, you would get 7 percent of $65?
11       A     That is correct.
12       Q     And for the month of October, what was the
13   7 percent number to you?
14       A     That, I don't know.
15       Q     Why not?
16       A     Because I haven't seen it.
17       Q     Who controls your bank account?
18       A     I'm sorry?  I don't --
19       Q     Who controls your bank account; Jimmy Lee
20   Simpson's bank account to which the sod money would
21   come in to?
22       A     I do.
23       Q     And you also control the bank account for
24   Havana Sod and Pallet, which is where the money is
25   generated from that pays Jimmy Lee Simpson the

1    **7 percent, right?**

2        A    That is true.

3        **Q    And you're sitting here under oath saying**

4    **you can't tell us today what those numbers are?**

5        A    Yes, I am.

6        **Q    And your ability to earn the 7 percent is**

7    **only as good as the contracts; verbal as they may**

8    **come up from somebody calling up and saying, hey, I**

9    **need some sod, and Havana Sod and Pallet decides to**

10    **produce off Jimmy Lee Simpson's property, right?**

11        A    That is correct.

12        **Q    And Havana Sod and Pallet produces from**

13    **other properties, right?**

14        A    Not -- they are on Simpson property now.

15    And that's where they're staying until this is

16    finished.

17        **Q    Previously, you testified, though, that**

18    **Havana Sod and Pallet was buying from other sod-**

19    **makers, right?**

20        A    That is true.

21        **Q    And they still have the ability to do**

22    **that, right?**

23        A    Once it becomes ready again because they

24    harvested out what they had on those farms.  And now

25    it's over with.

1    Q    **Hundred percent harvested out.**

2    A    I would say so, yes.

3    Q    **Who were those other sources?**

4    A    What -- I don't --

5    Q    **So, who were the other sources of sod from**

6  **which Havana Sod and Pallet purchased the sod?**

7    A    Sweetwater is one.

8    Q    **Who else?**

9    A    I would have to go get the name of the

10  other gentleman where we harvested grass off his

11  place off, too.

12    Q    **Where is that located?**

13    A    It's located in Havana.

14    Q    **What other information do you have about**

15  **it?**

16    A    I beg your pardon?

17    Q    **What other information do you have about**

18  **it?**

19    A    I don't understand.

20    Q    **Tell me as much information as you can to**

21  **help me identify who that sod source is?**

22    A    I don't have it with me.

23    Q    **Where are they located other than in --**

24    A    Havana.

25    Q    **-- Havana.  Where in Havana?**

1    A    North of town.

2    **Q    What road?**

3    A    Off 27.

4    **Q    How far?**

5    A    How far off 27?

6    **Q    How far north of 27 from the City of**

7    **Havana?**

8    A    I would say probably ten miles -- no, they

9    are five miles out of Havana.

10    **Q    And then what road do you turn off of to**

11    **get there?**

12    A    That, I don't know.

13    **Q    And then I believe you testified in**

14    **questions from Mr. Donohue and from me that Jimmy Lee**

15    **Simpson hasn't produced sod for the past six years**

16    **since --**

17    A    Until last year.  Last year, we produced

18    sod.

19    **Q    Until 2012.  So, there is a period that**

20    **there was no income whatsoever for Jimmy Lee Simpson**

21    **from sod; is that right?**

22    A    That is correct, off the -- yes.

23    **Q    And the only information that we have that**

24    **this plan is even feasible is the fact that you**

25    **produced or received $12,000 in income in 2012,**

1   correct?

2       A     If you say so.

3       Q     And that your, starting in October of 2013

4   first producing dollars, which, if everything works

5   out right, may equal the $12,000 you produced in

6   2012, right?

7       A     Yes.

8       Q     Prior to your six years of non-production,

9   except for 2012, the sod business that you were in

10  lost money every year, correct?

11      A     According to the books.

12      Q     Right.

13      A     Yes.

14      Q     And in fact, if Mr. Bell hadn't funded

15  Havana Sod and Pallet from 2004 on, Havana Sod and

16  Pallet would have been out of business during that

17  prior -- and during the period prior to the six-year

18  drought, right?

19      A     I don't think so.

20      Q     Well, where would you have gotten the

21  money?

22      A     I think that, if Mr. Bell hadn't been in

23  the picture when the gentlemen -- or three gentlemen

24  started not paying their bills that my wife said that

25  she wanted to cut them off, and Mr. Bell said he

1  wanted to stay with them -- they would have been shut

2  off and we would have been doing the business with

3  someone else.

4      **Q       But the fact remains that but for Mr. Bell**

5  **putting in money, Havana Sod and Pallet didn't**

6  **produce enough money to pay its bills, correct?**

7      A       That is correct.

8          THE COURT:  Mr. Penson, we're almost out

9      of time for today.

10         MR. PENSON:  Okay.  I don't think I have

11     any more questions today.

12         THE COURT:  Mr. Kelley, any questions of

13     Mr. Simpson for today?  Otherwise, we're going

14     to continue the hearing of necessity for further

15     evidentiary hearing.

16         MR. KELLEY:  No, Your Honor.  The

17     questions I would have asked, I can ask at

18     another time.

19         THE COURT:  Very well.

20         Thank you very much, Mr. Simpson.  You may

21     step down for today.

22         Ladies and Gentlemen, we are out of time

23     for this afternoon.  And so, we are going to

24     schedule the matter for a continued evident.

25         Counsel, do you have any idea how much

1      more time you may need so we can try to get this

2      matter on the docket?

3              MR. TURNAGE:  I think we've made some

4      headway, Judge.  I would think a couple of

5      hours, maybe three hours, you know, an afternoon

6      like, 2:00 to 5:00.

7              MR. DONOHUE:  I would think that would be

8      sufficient, Your Honor, three hours.

9              THE COURT:  All right.  Give me just a

10     moment, please.

11             Mr. Kelley, do you have any restrictions

12     to be able to appear telephonically on

13     December 10 beginning at 2:00 p.m.?

14             MR. KELLEY:  I do not, Your Honor.

15             THE COURT:  Thank you.

16             Does anyone else have a conflict that

17     you're aware of?

18             MR. DONOHUE:  Your Honor, I have no idea,

19     but I can check quickly when I get back to my

20     office.  I don't have my cellphone.

21             THE COURT:  Mr. Penson?

22             MR. PENSON:  Your Honor, I would have to

23     check that day.  I believe I'm in trial that day

24     in Walton County.  But I may be able to get

25     somebody else to cover that or cover this.

1          THE COURT:  Mr. Turnage?

2          MR. TURNAGE:  December 10th would work for

3     us, Judge.

4          THE COURT:  All right.  The hearing will

5     be scheduled either the afternoon of December 10

6     at 2:00 p.m. -- if there are conflicts, the

7     alternative date and time -- Mr. Kelley let me

8     know if you have 341s on this date -- would be

9     December 11 beginning at 9:00 a.m.  Any

10    conflict, Mr. Kelley?

11         MR. KELLEY:  That's fine.

12         THE COURT:  That's fine?

13         MR. KELLEY:  No conflict, Your Honor.

14         THE COURT:  All right.  Thank you.

15         Gentlemen, if you will please confer with

16    each other and let us know by tomorrow midday

17    which of those two dates will work with all

18    Counsel, then we will schedule the matter for a

19    three-hour final evidentiary hearing on

20    confirmation and on the motion to dismiss.

21         MR. DONOHUE:  Your Honor, who should we

22    check with?  Ms. Nah?

23         THE COURT:  Ms. Nah, the courtroom deputy,

24    yes, please.  And why don't we let Mr. Turnage

25    be the spokesperson for all Counsel.  If

1    everyone would please let Mr. Turnage know if

2    there are any conflicts.

3          Mr. Turnage, does the 11th work for you as

4    an alternative date?  As far as you know.

5          MR. TURNAGE:  As far as I know, Your

6    Honor.  I'm certain one or the other will work.

7    I can work my schedule around whatever fits the

8    rest of Counsel.

9          THE COURT:  All right.  Very well.

10         Are there any other documents that the

11   parties intend to introduce into evidence?  All

12   right.

13         There being nothing further, this hearing

14   will be continued as announced.  Thank you.

15         (Proceedings concluded at 2:45 p.m.)

16                    * * * * *

17

18

19

20

21

22

23

24

25

HEARING - IN RE:  JAMES LEE SIMPSON - 11/18/2013

1                      C E R T I F I C A T E

2     STATE OF FLORIDA )

3     COUNTY  OF  LEON )

4          I, ANDREA KOMARIDIS, Court Reporter and

5     Notary Public at Tallahassee, Florida, do hereby

6     certify as follows:

7          THAT I correctly reported in shorthand the

8     foregoing proceedings, at the time and place as

9     stated in the caption hereof;

10         THAT I later reduced my stenographic notes

11    through computer-aided transcription, or under my

12    supervision, to typewritten copy, and that the

13    foregoing pages, numbered 1 through 65, both

14    inclusive, contain a full, true, and correct

15    transcript of the proceedings on said occasion;

16         THAT I am neither of kin nor of counsel to

17    any of the parties involved in this matter, nor in

18    any manner interested in the results thereof;

19         THIS 3rd OF December, 2013.

20

21

22     ANDREA LYNNE KOMARIDIS
       MY COMMISSION # EE866180
       EXPIRES February 09  2017
       (407) 366-0153    FloridaNotaryService.com

23     _____
       ANDREA KOMARIDIS
       Notary Public, Florida

24

25                   * * * * *

MERIT REPORTING - (850) 224-6262